Thomas C Corcovelos    Bar # 70493
**Law offices of Thomas C Corcovelos**
1001 Sixth Street, Suite 150
Manhattan Beach, CA 90266
310-374-0116

Attorney for MAMMOTH HENDERSON II LLC
The Debtor and Debtor in Possession

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

In re

**MAMMOTH HENDERSON II LLC**

Debtor.

Case No.  8:09-bk-22234-RK

Chapter  11

**DEBTOR'S DISCLOSURE STATEMENT DESCRIBING DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**

Disclosure Statement Hearing
Date:
Time:
Place:    Courtroom


Plan Confirmation Hearing
[See Disclosure Statement for Voting and Objection Procedures]
Date:      [To Be Set]
Time:      [To Be Set]
Place:

1

**TABLE OF CONTENTS**

**INTRODUCTION**................................................  1
A. Purpose of This Document................................  7
B.Deadlines for Voting and Objecting;..........................
Date of Plan ................................................9
Confirmation Hearing.........................................
1.Time and Place of the Confirmation Hearing................  9
2.Deadline For Voting For or Against the Plan................  9
3.Deadline For Objecting to the Confirmation of the Plan..... 10
4. Identity of Person to Contact for More Information...........
    Regarding the Plan.......................................  11
C.Disclaimer................................................ 11
A.Definitions.............................................. 15
B.Interpretations,Computation of Time and Governing Law.......299
1. Undefined Terms.......................................... 26
2.Rules of Interpretation.................................. 26
3.Computing Time Periods...................................31
4.Section Numbers.........................................31
5.Notices and Delivery of Documents...........................31


**BACKGROUND** ............................................... 32
A.Description and History of the Debtor's Business........... 32
B.Principals/Affiliates of Debtor's Business................... 38
C.Management of the Debtor Before and After the Bankruptcy.....38
D.Events Leading to Chapter 11 Filing........................38
E.Significant Events ........................................ 46
1.Bankruptcy Proceedings.................................... 47
2.Other Legal Proceedings.................................. 43
3.Actual and Projected Recovery of Preferential or
    Fraudulent  Transfers....................................48
4.Procedures Implemented to Resolve Financial Problems....... 48
5.Current and Historical Financial Conditions................ 48

**SUMMARY OF THE PLAN OF REORGANIZATION**...................... 49
A.What Creditors and Interest Holders Will Receive Under The.....
Proposed Plan...............................................49
B.Unclassified Claims....................................... 49
1.Administrative Expenses.................................. 49
2.Priority Tax Claims...................................... 51
C.Classified Claims and Interests........................... 52
1. Classes of Secured Claims................................ 52
2. Classes of Priority Unsecured Claims ....................... 66
3. Class of General Unsecured Claims........................ 67
4. Class(es) of Interest Holders............................ 68
5. Resolution of State Court Actions........................ 69
D. Means of Effectuating the Plan........................... 70
1.Funding for the Plan..................................... 70
2.Post-Confirmation Management............................. 70
3.Disbursing Agent........................................ 70
E.Risk Factors............................................. 71
F.Other Provisions of the Plan............................. 71
1.Executory Contracts and Unexpired Leases.................. 71

2

a. Assumptions .......................................... 71
b. Rejections ........................................... 72
2. Changes in Rates Subject To Regulatory Commission.......... 72
3. Retention of Jurisdiction................................. 73
G. Tax Consequences of Plan.................................. 73

**CONFIRMATION REQUIREMENTS AND PROCEDURES**.................... 73
A. Who May Vote or Object................................... 74
1. Who May Object to Confirmation of the Plan................ 74
2. Who May Vote to Accept/Reject the Plan................... 74
a. What Is an Allowed Claim/Interest........................ 75
b. What Is an Impaired Claim/Interest....................... 75
3. Who Is Not Entitled to Vote.............................. 76
4. Who Can Vote in More Than One Class....................... 77
5. Votes Necessary to Confirm the Plan...................... 77
6. Votes Necessary for a Class to Accept the Plan............. 77
7. Treatment of Nonaccepting Classes........................ 77
8. Request for Confirmation Despite Nonacceptance by Impaired.....
Class(es) .......................................... 78
B. Liquidation Analysis..................................... 78
C. Feasibility ............................................ 83
**EFFECT OF CONFIRMATION OF PLAN**............................ 84
A. Discharge ............................................. 85
B. Revesting of Property in the Debtor...................... 85
C. Modification of Plan.................................... 85
D. Post-Confirmation Status Report.......................... 86
E. Post-Confirmation Conversion/Dismissal................... 86
F. Final Decree........................................... 86

**SUPPORTING DECLARATIONS**.................................. 87
EXHIBIT A - LIST OF All ASSETS.............................. 88
EXHIBIT B - LIST OF LITIGATION/SUMMARY OF LITIGATION.......... 91
EXHIBIT C - FINANCIAL PROJECTIONS .......................... 93
EXHIBIT D - LIST OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES TO BE ASSUMED ........................... 93
EXHIBIT E- LIST OF GENERAL UNSECURED CREDITORS ............. 94
EXHIBIT F- LIST OF Equity Interest Holders................. 95
EXHIBIT G- LAST TWO YEARS FINANCIAL STATEMENTS.............. 96

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

# I.

## INTRODUCTION

MAMMOTH HENDERSON II LLC the Debtor in this Case[1], provides this Disclosure Statement to all of its Creditors, Equity Security Holders, and to other parties in interest in the Case.

The Debtor commenced its Bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code, ("Code") Sections 101-1330, on November 5, 2009 (the "Petition Date").  The Debtor is continuing in the operation and management of its business pursuant to Bankruptcy Code Sections 1107 and 1108.

Section 1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement[2].  The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical Creditor or Equity Security Holder to make an informed judgment about the Plan and to enable such Creditor or Equity Security Holder

---

[1]    The definitions of the capitalized terms used in this Disclosure Statement are contained in Section II. of this Disclosure Statement.
[2]    Section 1125(b) provides, in pertinent part, as follows:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information....

11 U.S.C. § 1125(b) (2003).

to determine whether it is in his best interest to vote for (accept) or against (reject) the Plan.

Chapter 11 of the Bankruptcy Code allows debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  The plan may provide for debtors to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtor is the party proposing the Plan sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN. This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan.  The Debtor urges you to read this Disclosure Statement because it contains important information concerning the Debtor's history, business, assets, and liabilities and sets forth a summary of the Plan.

The Debtor's Plan is a reorganization plan accomplished through the continuation of Debtor's primary business, the management and lease-up of commercial real estate. In other words, the Plan Proponent (i.e., the Debtor) seeks to accomplish payment under the Plan primarily through the cash flow generated from the leasing of the Mammoth Property and through proceeds from a future sale or refinance of the Mammoth Property.  The Plan may provide for the Debtor to reorganize by continuing to operate and refinance or, to liquidate by selling assets of the estate, or a combination of both.  The Debtor, MAMMOTH HENDERSON II LLC is the party proposing the Plan sent

to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a <u>reorganizing</u> Plan.  In other words, the Proponent seeks to accomplish payments under the Plan by <u>restructuring one note held by U.S. Bank and converting mechanics liens to deeds of trust.  Secured creditors of the estate shall be paid the present value of their claim at a market interest rate over a 24 month to 84 month period, excepting that their claims may be paid in full prior to the seventh year through a sale or refinance of the Mammoth Property.</u>  The Effective Date of the proposed Plan is October 19, 2010.

The Distributions under the Plan will be made from available Cash and Net Sale Proceeds.

The Plan will be implemented through the following means:

• Robert Wish the Managing Member of the Debtors current manager, will provide oversight and assistance in the operation of the Debtor's business and day-to-day management decisions.  Robert Wish will work to lease the remaining vacant space in the Mammoth Property.

• The proceeds generated from the leases on the Mammoth Property and any future refinance or sales proceeds generated by the Mammoth Property will be used to fund the payments to both Secured and Unsecured Creditors provided for under the Plan. It is anticipated that there will be sufficient funds from these proceeds to pay all Allowed Secured and Allowed Unsecured Claims as follows:

• Secured Creditor U.S. Bank shall be paid in full on or before the 84th month following the Effective Date, The Clark County Tax Collector will be paid in full on or before the 72nd month following the Effective Date, Secured Creditor New Life Carpets shall be paid in full on or before the 84th month following the Effective Date, Secured Creditor American Constructors Inc., shall be paid in full on or before the 84th month following the Effective Date Allowed Class 5 General Unsecured Claims may elect to receive a one-time lump sum payment equal to 50% of their allowed claim as payment in full on the 13th month following the Effective Date or 100% of their allowed claim as payment in full on or before the 84th month following the Effective Date.

**A MORE COMPLETE DESCRIPTION OF THE PROVISIONS OF THE PLAN AND THE MEANS OF EFFECTUATING THE PLAN ARE LOCATED AT SECTION IV.D. BELOW.**

## A.  Purpose of this Document

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.  This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtor's business operations, the applicable provisions of the Bankruptcy Code, or any other matter which may be deemed significant by Creditors or Interest Holders. Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive overall data,

legal documents and legal principles, including provisions of the Bankruptcy Code, and to set them forth in understandable, readable form.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

1. **WHO CAN VOTE OR OBJECT;**

2. **WHAT THE TREATMENT OF YOUR CLAIM IS, (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

3. **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

4. **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

5. **WHAT IS THE EFFECT OF CONFIRMATION; AND**

6. **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as all of this Disclosure Statement.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has conditionally approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the

8

Plan.   However,   the   statements   and   conclusions   set   forth   in
this   document   are,   unless   otherwise   noted,   those   of   the
Proponent   of   the   Plan.     The   accuracy   has   not   yet   been
determined   by   the   Court,   and   the   Court   may   determine   such
accuracy   at   the   hearing   regarding   whether   or   not   to   confirm   the
Plan.

**B.** **Deadlines for Voting and Objecting; Date of Plan**
**Confirmation Hearing**

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS**
**DISCLOSURE STATEMENT.   IN OTHER WORDS, THE TERMS OF THE PLAN**
**ARE NOT YET BINDING ON ANYONE.   HOWEVER, IF THE COURT LATER**
**CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL**
**CREDITORS AND INTEREST HOLDERS IN THE CASE.**

**1.** **Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not
to confirm the Plan will take place on _____,
2010, at _____ A.M., Courtroom _____

Deadline for Voting for or Against the Plan
If you are entitled to vote, it is in your best interest to
vote timely on the enclosed ballot
and return the ballot in the enclosed envelope to **Corcovelos**
**Law Group**, to the attention of Tom Corcovelos 1001 Sixth
Street, Suite 150  Manhattan Beach, CA 90266 Telephone: (310)-
374-0116.  Your ballot must be received by _____, 2010,
at 5:00 P.M. California time, or it will not be counted.

Since mail delays may occur, and because time is of the
essence, it is important that ballots be mailed well in advance

9

of the date specified hereinabove as the deadline for **Corcovelos Law Group** to receive ballots.  Any ballots received after that date will not be included in any calculation to determine whether the Debtor's Creditors and Interest Holders have accepted or rejected the Plan.

    **2.**    **Deadline for Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served upon **Corcovelos Law Group**, to the attention of Thomas C Corcovelos  1001 Sixth Street, Suite 150 Manhattan Beach, CA 90266, Telephone: (310)-374-0116, by _____, 2010, at 5:00 P.M. California time.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes of Claims and Interests created under the Plan, and if not, whether the Bankruptcy Court should nevertheless confirm the Plan.  If at the Confirmation Hearing the Bankruptcy Court determines that the Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order.  Pursuant to Section 1141 of the Bankruptcy Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding upon the Debtor and each of its Creditors and Interest Holders, regardless of whether each Creditor or Interest Holder voted to accept the Plan.

**3.**     **Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan may contact Thomas C Corcovelos at **Corcovelos Law Group**, 1001 Sixth Street, Suite 150 Manhattan Beach, CA 90266, Telephone: (310)-374-0116

C.   **Disclaimer**

The Plan involves the payment of Claims from available Cash, from cash flow generated through the leasing of the Mammoth Property, from a refinance of the Mammoth Property, or from the Net Sales Proceeds from the sale of the Mammoth Property. The Debtor projects that there will be sufficient funds available to make the payments called for under the Plan. The Debtor's financial projections filed in support of the Plan (included in **Exhibit C** attached hereto**)** were prepared by the Debtor.

THE PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT REPRESENT A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS SET FORTH WITH SUCH PROJECTIONS.  THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR.  BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS, THE DEBTOR'S ACTUAL CASH FLOW MAY WELL BE DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF THE CREDITORS.

The projections are intended to assess the future cash

flow available to the Debtor for making the distributions required by the Plan.  Significant assumptions underlying the financial projections include the following:

1.   Effective Date of the Plan

For the purpose of the Projections, the Debtor estimates that the Confirmation Date will occur in or about December 20, 2010 and hence, that the Effective Date will occur in or about October 19, 2010 with first payments under the plan being made on October 19, 2010.

2.   Earnings Generated by the Mammoth Property

The Debtor's projection of the future earnings which will be generated by the Mammoth Property is derived from Debtor's estimate of the revenue which the Mammoth Property will generate after the Confirmation Date.

3.   Expenses of the Debtor

The Debtor has assumed, for the purpose of the Projections that their expenses will not increase by any significant amount, except as specifically set forth in the Projections, during the term of the Plan.

The information contained in this Disclosure Statement is provided by the Debtor.   The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.   The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

12

The financial data relied upon in formulating the Plan is based on the Debtor's post-petition financial projections, the Debtor's Bankruptcy Schedules, Robert Wish's development and management experience, and the financial information contained in pleadings filed with the Bankruptcy Court. This information was not audited or reviewed by an independent accountant and the Debtor is unable to warrant or represent that such financial information is without any inaccuracies, although Debtor believes it has made reasonable efforts under the circumstances to present such financial information fairly and accurately. The Debtor represents that everything stated in the Disclosure Statement is true to the best of Debtor's knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**THIS IS A SOLICITATION BY THE DEBTOR. THE REPRESENTATIONS HEREIN ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR CONSULTANTS. NO REPRESENTATIONS CONCERNING THE DEBTOR OR POST-CONFIRMATION DEBTOR, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO THE POST-CONFIRMATION DEBTOR'S FUTURE ACTIVITIES, THE VALUE OF ITS PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE DEBTOR'S ESTATE, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE**

RELIED UPON BY ANY PARTY IN INTEREST. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT REGARDING THE DEBTOR HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT. RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR. THE DEBTOR BELIEVES THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION AS ACCURATELY AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS. HOWEVER, THE FINANCIAL INFORMATION CONTAINED HEREIN REGARDING THE DEBTOR IS NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY. COUNSEL FOR THE DEBTOR HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN AND MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING ON THE PLAN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR AND OTHER PARTY IN INTEREST SHOULD CONSULT WITH HIS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT, AND/OR ACCOUNTANT PRIOR TO VOTING TO

**ENSURE A COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS AND INTEREST HOLDERS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES TO THE PLAN BY THE DEBTOR, ASSUMING IT IS ACCURATE. HOWEVER, THE BANKRUPTCY COURT HAS NOT YET DETERMINED THE ACCURACY OF SUCH INFORMATION. IT MAY DO SO AT THE CONFIRMATION HEARING.**

DEFINITIONS, INTERPRETATIONS, AND RULES OF CONSTRUCTION

1. "**Administrative Claim**" means a Claim for costs and expenses of the administration of the Case under Sections 503(b) or 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries, or commissions for services); (b) all Claims of professionals employed at the expense of the Estate; and (c) any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

2. "**Allowed Administrative Claim**" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(b) of the Bankruptcy Code.

15

3.  **Allowed Amount** means the amount of any Claim against the Debtor determined in accordance with Sections 502 and 506(a) of the Bankruptcy Code and any other applicable Section of the Bankruptcy Code, and recognized by the Debtor as value or allowed by Final Order of the Court, except to the extent described or defined otherwise herein.

4.  "**Allowed Claim**" means a Claim: (a) with respect to which a Proof of Claim has not been filed but the Claim has been listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, or unliquidated as to amount and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order; or (b) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order. **Class _____ Claim** means an Allowed Claim in the particular Class described.

5.  **Allowed Class _____ Interest** means an Allowed Interest in the particular Class described

6.  **Allowed Class _____ Interest** means an Allowed Interest in the particular Class described

7.  "**Allowed General Unsecured Claim**" means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code,

16

including, without limitation, an Allowed Claim based on the rejection of an executory contract or unexpired lease.

8. "**Allowed Priority Claim**" means an Allowed Administrative Claim, Allowed Priority Tax Claim, or Allowed Priority Unsecured Claim.

9. "**Allowed Priority Tax Claim**" means an Allowed Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

10. "**Allowed Priority Unsecured Claim**" means an Allowed Claim entitled to priority pursuant to Sections 507(a)(3), 507(a)(4), or 507(a)(6) of the Bankruptcy Code.

11. "**Allowed Secured Claim**" means an Allowed Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

12. "**Amended U.S. BANK Security Documents**" means the U.S. BANK SECURITY DOCUMENTS as they relate to the U.S. BANK first trust deed encumbering the Mammoth Property, as amended pursuant to the Plan.

13. "**American Constructors Inc.,**" means American Constructors Inc., the holder of a $4,522 mechanics lien recorded against the Mammoth Property.

17

14. **"Approved Date"** means the date on which an Order approving the Disclosure Statement, or an amended version thereof, is entered by the clerk on the Court's docket.

15. "**Avoidance Action**" means any action which is filed or which may be filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, any actions based on applicable nonBankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, or any other similar action or proceeding filed to recover property for or on behalf of the Estate or to avoid a lien or transfer.

16. "**Ballot**" means the form distributed to holders of claims and interests on which is to be stated an acceptance or rejection of the Plan.

17. "**Bankruptcy Code**" means Title 11 of the United States Code, as now in effect or hereafter amended.  All citations in the Plan to section numbers are to the Bankruptcy Code unless otherwise expressly indicated.

18. "**Bankruptcy Court**" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division, which has jurisdiction over the Case and the Estate of the Debtor, or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under Chapter 11 of the Bankruptcy Code and all applicable statutes, rules, and regulations pertaining thereto.

19. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for use in the Bankruptcy Court, as now in effect or hereafter amended.

20. **Bar Date**" means the last date for filing Proofs of Claim other than Administrative Claims or Claims based upon the rejection of any executory contracts or unexpired leases. The Bar Date for filing Proofs of Claim was set by the Bankruptcy Court as _____.

21. **Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

22. "**Case**" means the Debtor's Chapter 11 case which was filed in the Bankruptcy Court, as Case 8:09-bk-22234-RK-

23. "**Cash**" means cash and cash equivalents, including, but not limited to, checks or similar forms of payment or exchange.

24. "**Claim**" means: (a) a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

25. "**Claimant**" means the holder of a Claim.

26. "**Class**" means a grouping into which Claims or Interests which are substantially similar to other Claims or Interests have been classified pursuant to Article IV of the Plan.

27. "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court.

28. "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

29. "**Confirmation Hearing**" means the hearing, including any continued or postponed session thereof, at which time the Bankruptcy Court will consider and determine whether to confirm the Plan.

30. "**Confirmation Order**" means the order, as entered, of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

31. "**Corona Loan" or "Corona Note**" means the U.S. Bank Note encumbering the Corona Property

32. **Corona Property"** means the Class A office building located at 4750 Green River Road, Corona, California totaling 57,204 square feet.

33. "**Creditor**" means the holder of an Allowed Claim.

34. "**Debtor**" means MAMMOTH HENDERSON II LLC organized under the laws of the state of California, the debtor and debtor-in-possession in the Case.

35. **Disallowed Claim**" means a Claim against the Debtor, which Claim is disallowed pursuant to an order of the Bankruptcy Court as to which eleven (11) calendar days have

passed following entry of such order and no stay pending an appeal of such order is obtained during such period

36. **Disbursing Agent**" means the person or entity charged with making Distributions pursuant to the terms of the Plan. Pursuant to the Plan, the Reorganized Debtor will serve as the Disbursing Agent under the Plan.

37. "**Disclosure Statement**" means the Disclosure Statement (and all exhibits or schedules annexed thereto or referenced therein) which accompanies the Plan, as the Disclosure Statement may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

38. "**Disputed Claim**" means any Claim: (a) listed on the Debtor's Schedules as unliquidated, disputed, or contingent; or (b) as to which the Debtor, or any other party in interest, has interposed a timely objection or request for estimation or subordination in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation or subordination has not been withdrawn or determined by a Final Order. A Claim will be considered a Disputed Claim in its entirety if an objection is timely filed to any portion of such Claim.

39. "**Disputed Claims Reserve Account**" means the segregated account to be created for holding the pro-rata share of any Disputed Claims pending final resolution of the Disputed Claim.

40. "**Distribution**" means the Cash which is required to be distributed under the Plan to the holders of Allowed Claims.

41. "**Effective Date**" means the date not later than ninety (90) days following the date upon which the Confirmation Order becomes a Final Order; provided, however, that, if an appeal of the Confirmation Order is timely filed, the Debtor may elect to cause the Plan to become effective, notwithstanding the pendency of such appeal, so long as no stay of the Confirmation Order is in effect, by filing with the Bankruptcy Court a notice of such election, in which event the Plan will become effective as provided herein.

42. "**Equity Security Holder**" means the holder of an Interest in the Debtor.

43. "**Estate**" means the estate created under Section 541 of the Bankruptcy Code in the Case.

44. "**Exhibits**" means those exhibits annexed to the Plan or Disclosure Statement or incorporated by reference in the Plan or Disclosure Statement.

45. "**File**," "**Filed**," or "**Filing**" means filed with the Bankruptcy Court having jurisdiction over the Case.

46. "**Final Distribution**" means, for each Class, the last Distribution to be made to holders of Allowed Claims in that Class.

47. "**Final Order**" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which the Debtor is a party, which has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and

as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending; or (b) any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor; or (c) any appeal, petition for certiorari, reargument or rehearing has been resolved by the highest court to which the order or judgment was appealed timely or from which certiorari, reargument, or rehearing was sought.

48. "**Financial Projections**" means the financial statements prepared by the Debtor which sets forth, among other things, the Debtor's cash flow projections, and which is attached as Exhibit "C" hereto.

49. "**General Unsecured Claim**" means an unsecured Claim against the Debtor that is not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Claim based on the rejection of an executory contract or unexpired lease.

50. "**Guarantors**" means Robert Wish and Mammoth Equities, the Guarantors of the U.S. Bank Note.

51. **Henderson II**" means Mammoth Henderson II the owner of the Henderson Property.

52. **"Henderson Loan" or "Henderson Note"** means the note and deed of trust executed in favor of PFF encumbering the Henderson Property and guaranteed by Robert Wish and Mammoth Equities.

23

53. **"Henderson  Property"** means  the  three-story  66,284 Square foot Class A office building and 2 multi-tenant retail buildings totaling 13,582 square feet (8,368 and 5,351 square feet respectively)located on 2470 Saint Rose Parkway, Henderson Nevada.

54. **"Interest**" means a membership interest in the Debtor.

55. **"Mammoth Henderson or Mammoth Partnership"** means MAMMOTH HENDERSON II, the debtor and debtor in possession.

56. **"Mammoth  Adversary  Proceeding"** means  the  lawsuit previously pending in state court against U.S. Bank known as MAMMOTH HENDERSON II , a Nevada Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company, vs. U.S. Bank, N.A. a national banking association as successor in interest  to  PFF  BANK  &  TRUST;  and  DOES  1  through  100, inclusive, "case No. CIVRS911734 that the Debtor removed to bankruptcy  court  on  November  25,  2009  as  an  adversary proceeding in bankruptcy court, case No. 8-09:-AP-01763RK.

57. **"Mammoth Corona I"** means the owner of the Corona Property.

58. **"Mammoth  Equities"** means  Mammoth  Equities,  LLC  the managing member of the Debtor.

59. "**Mammoth Land"** means the 5.96 net acres of land upon which the Mammoth Property was constructed.

60. "**Mammoth Loan"** means the loan encumbering the Mammoth Property, specifically the U.S. BANK NOTE.

61. **"Mammoth Property"** means the three-story 66,284 Square foot Class A office building and the 2 multi-tenant retail

buildings totaling 13,582 square feet (8,368 and 5,351 square feet respectively)located on 2470 Saint Rose Parkway, Henderson Nevada.

62. **"Mammoth State Court Actions"** means the lawsuit previously pending in state court against U.S. BANK known <u>as</u> <u>MAMMOTH HENDERSON II</u> , a Nevada Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company; vs. U.S. Bank, N.A. a national banking association as successor in interest to PFF BANK & TRUST; and DOES 1 through 100, inclusive, "case No. CIVRS911734.

63. **"New Life Carpets"**  means New Life Carpets Inc., the holder of a $2,363 mechanics lien recorded against the Mammoth Property.

64. **"Net Sales Proceeds"** means all of the Cash proceeds from the sale of the assets of the Estate minus all costs of sale and administrative expenses of the Estate including, but not limited to, the fees and expenses of the Disbursing Agent and Professionals employed by the Estate, income taxes and payments pursuant to the Plan to creditors holding Allowed Administrative Claims, Allowed Priority Claims and/or Allowed Secured Claims.

65. **"NOD"** means Notice of Default.

66. **"Order"** means an order or judgment of the Bankruptcy Court as entered on the Court's docket.

67. **"Person"** means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, government or any

25

political subdivision, governmental unit (as defined in the Bankruptcy Code) or official committee appointed by the United States Trustee.

68. "**Petition Date**" means November 5, 2009, the date on which the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code, commencing the Case.

69. "**PFF**" means PFF Bank and Trust the original holder of the beneficial interest in: (1) the first deed of trust encumbering the Mammoth Property.

70. "**Plan**" means the Debtor's Chapter 11 Plan of Reorganization, as the Plan may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

71. "**Post-Confirmation Estate Claims**" means any and all claims and causes of action which constitute property of the Estate including, but not limited to, any Avoidance Actions, whether or not such claims or causes of action are the subject of litigation pending as of the Effective Date.

72. "**Post-Petition Earnings**" means any funds received by Debtor since the Petition Date.

73. "**Reorganized Debtor**" means the Debtor, MAMMOTH HENDERSON II LLC, a Nevada Limited Liability Company, on and after the Effective Date, the entity which shall assume all of the rights and obligations of the Debtor together with title to and control of the Debtor's assets and liabilities upon Confirmation of the Plan, as such rights, obligations, assets and liabilities are modified in the Plan.

26

74. "**Robert Wish**" means Robert Wish, the managing member of Mammoth Equities LLC, the Manager of MAMMOTH HENDERSON II LLC.

75. **"Schedules"** means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as amended, modified, or supplemented from time to time.

76. **"Secured Claim"** means a Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

77. "**Secured Creditor**" shall mean the holder of an Allowed Secured Claim.

78. "**Tax Collector**" means the Riverside County Treasurer/Tax Collector or its successors-in-interest..

79. **"Unclaimed Distribution**" means any Distribution which is unclaimed as a result of any of the following: (a) checks which have been returned as undeliverable without a proper forwarding address; (b) checks which were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same; (c) checks which remain unnegotiated for a period of ninety (90) days after the date of issuance.

80. "**Unclassified Claims**" means the Allowed Amount of (I)
all Administrative Claims of the Debtor's Case, allowed
pursuant to Section 503(b) of the Bankruptcy Code; and (ii) all
Priority Tax Claims entitled to priority pursuant to
SECTION507(a)(8) of the Bankruptcy Code.

81. "**Unsecured Creditors**" means Creditors holding Allowed
Unsecured Claims against the Debtor for which there are no
assets of the Debtor serving as a security, but not including
Priority Claims.

82. "**U.S. Bank**_" means U.S. Bank the successor in interest
to PFF Bank and Trust and the holder of the beneficial interest
in the first deed of trust encumbering the Mammoth Property.

83. "**U.S. BANK NOTE**" means that certain promissory
Note and construction loan agreement secured by a first deed of
trust encumbering the Mammoth Property, in the principal amount
of $22,301,000 as of the petition date, of U.S. Bank as
successor in interest to PFF, including all amendments and
modifications thereto.

84. "**U.S. BANK FIRST NOTE**" means that certain recourse
promissory note to be executed by the Reorganized Debtor as
maker in favor of the current holder of the U.S. BANK NOTE
pursuant to the Plan in an amount equal to the amount of the
U.S. Bank Claim secured by a first deed of trust encumbering
the Mammoth Property as of the Effective Date.

85. "**U.S. BANK SECURITY DOCUMENTS**" means all documents
creating or evidencing a first priority lien secured by Mammoth
Property as all such documents may have been amended or

modified from time to time, including, without limitation, that certain Deed of Trust with Assignment of Rents dated December 11, 2006.

86. **"U.S. Bank State Court Actions"** * means the June 11, 2009 "NOD and Demand for Immediate Payment" non-judicial foreclosure proceedings initiated by U.S. Bank against the Debtor.

87. **"Wage Claimant"** means a Claimant asserting a Claim pursuant to Section 507(a)(3) or (a)(4) of the Bankruptcy Code.

Interpretations, Computation of Time and Governing Law

## 4.    Undefined Terms

Any term used in the Disclosure Statement that is not defined in the Disclosure Statement, either in Section II.A (Definitions) or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

## 5.    Rules of Interpretation

For the purposes of the Disclosure Statement:

a. Whenever, from the context, it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural.

b. Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.

c. Any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified, or supplemented as of the Confirmation Date.

d. Unless otherwise specified in a particular reference in the Plan, all references in the Plan to Sections, Articles or Exhibits are references to Sections, Articles and Exhibits of or to the Plan.

e. Unless otherwise specified in a particular reference in the Plan, the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than only to a particular paragraph, subparagraph, or clause contained in the Plan.

f. Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

g. The rules of construction set forth in Bankruptcy Code Section 102 shall apply.

h. The provisions of the Plan will control over any description thereof contained in the Disclosure Statement.

i. Any term used in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules.   Without limiting the foregoing, the rules of construction set forth in Section 102 of the Bankruptcy Code

shall apply hereto.  The definitions and rules of construction contained herein do not apply to the Disclosure Statement or to the exhibits to the Plan except to the extent expressly so stated in the Disclosure Statement or in each exhibit to the Plan.

j. Except to the extent that federal law, including the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced for all purposes in accordance with, the laws of the State of California, without giving effect to any principles of conflict of laws thereof. All exhibits to the Plan are incorporated into the Plan and will be deemed to be included in the Plan, regardless of when they are filed.

### 6.    Computing Time Periods

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 7.    Section Numbers

References in the Plan and Disclosure Statement to a Code section are references to the United States Bankruptcy Code (Title 11 of the United States Code) except as otherwise indicated.

### 8.    Notices and Delivery of Documents

All notices, correspondence, and other deliveries under this Disclosure Statement must be directed as follows:

| To the Debtor or<br>Reorganized Debtor: | MAMMOTH HENDERSON II LLC<br>Attn: Robert Wish<br>29222 Rancho Viejo Road<br>San Juan Capistrano, California |
|---|---|
| With a Copy to: | Thomas C Corcovelos  Esq.<br>CORCOVELOS LAW GROUP<br>1001 Sixth Street, Suite 150<br>Manhattan Beach, California 90266<br>310-374-0116 |

## II.

### BACKGROUND

### A. Description and History of the Debtor's Business

The Debtor, MAMMOTH HENDERSON II LLC, (Mammoth) is a Nevada Limited Liability Company that was formed On May 31, 2005 by Robert Wish to acquire the Mammoth Land and develop the site into a class A multi-tenant office and located at 2470 Saint Rose Parkway, Henderson Nevada.  There are 2 LLC Members that invested in the Debtor, one of whom the Dingillo Family LLC, contributed the Mammoth Land to the Mammoth Henderson II LLC partnership in exchange for an 81.4% membership interest (totaling 8,139 units) with the 18.6% balance of the membership interest (totaling 1,861 units) being acquired by Henderson Parcel A, LLC for a payment of $700,000 to the prior owner of the 18.6% interest in the Mammoth Land. The major asset of the Dingillo Family LLC is the Mammoth Land which essentially represents their life savings. Neither Robert Wish nor Mammoth Equities own any of the membership interest in the Debtor. Robert Wish and Mammoth Equities are the LLC members fiduciary, managing the Mammoth Property and handling all legal issues for the Debtor and attempting through the chapter 11 filing to

protect the life savings of the LLC members.

Prior to 2009, neither Robert Wish nor any of the partnerships he had formed over his 35 years in the real estate business had ever filed a chapter 11 and he made concerted efforts to avoid filing the herein referenced chapter 11 case as detailed in section II D of this Disclosure Statement. The Mammoth Land was acquired on May 12, 2005 for $3,980,320, with construction of The Mammoth Property commencing in March, 2007. Construction of the Mammoth Property was completed in June, 2008, with the certificate of occupancy being issued on or about July, 2008. The Mammoth Property consists of one three-story 66,284 sf class A multi tenant office building consisting of 55 suites divisible down to 2 office suites. The design and flexibility of the Mammoth Property is unique and is founded upon a model formulated by Robert Wish and fine tuned over a 35 year period of management and development. The Mammoth Property utilizes a multi-tenant courtyard concept, which offers turnkey class-A office suites to small businesses. Surrounding a lavish and lushly landscaped courtyard with water features and tropical landscape, The Mammoth Property offers small businesses preconfigured 1-10+ room office suites.  Suites are independently metered giving tenants individual control of their utilities including HVAC.  The Mammoth Property offers "plug and play" telephone and data allowing tenants to simply move in furniture and begin operations.  Many tenants occupy space the same week the lease is signed.  Larger suites (5-10 rooms) feature additional amenities such as high-end granite

1  reception desks and chrome T-bar ceilings.

2      Focusing on the needs of tenant, each room within the

3  Mammoth Property has a window and each suite is rough plumbed

4  with water and sewer.  Additionally, the buildings feature high

5  capacity elevators (with emergency battery backup), secured

6  off-hour access, locked restrooms and video monitoring.

7      The spaces range from 250 to 3,000 square feet with an

8  average suite size of 1,150 square feet.  Suites are move-in

9  ready and finished to be suitable for most small business

10 tenants.  A major contributory factor to the effectiveness of

11 this model is the small tenant niche; 90% of businesses in

12 America are 20 employees or less.  There are only so many ways

13 a small tenant can layout small space.  Over the years, Mammoth

14 Equities has developed proprietary layouts that virtually all

15 general office users with less than 20 employees fit into.

16 These preconfigured suites have been engineered over the years

17 to maximize efficiency and functionality.

18     Thirty-five years in the industry have contributed to this

19 proprietary model that Mammoth Equities now employs in ten

20 cities in three states.  The model was specifically designed to

21 minimize Tenant Improvement capital expenditures and maximize

22 profitability.  The buildings function much like an apartment

23 building with shorter leases for "as is" space.  It is not

24 uncommon for stabilized Mammoth buildings to have a waiting

25 list. This model has proven successful over the past several

26 years.

27 Averaging 2 to 3 year lease terms, the Mammoth Property is

28

geared to a high turnover model.    Small businesses tenants' needs can change drastically in three years.    Accordingly, the short lease term and immediate occupancy provide them critical flexibility with minimal out of pocket expenses (i.e. No TI's) to get up and operational.    Small tenants are less concerned with the "customization" of their spaces due to the shorter lease term.

Each building has 24 hour access with access after 7:00 PM by way of magnetic key that unlocks the front door of each lobby.    From a marketing standpoint, the design and flexibility of the Mammoth Property offers great competitive advantage over other new offices in the market area as a potential tenant can designate any number of offices they require and on the same day, obtain occupancy. Other new projects in the market area are not truly competitive as a tenant has to wait weeks or even months to occupy as the offices are in shell condition and must be built out prior to occupancy. Moreover, from a practical standpoint in a recessionary environment where banks and lending institutions are rarely making loans on real estate, an office building that requires no tenant improvement dollars in order for a tenant to sign a lease and occupy space has an overwhelming advantage over other new office buildings that are in a shell condition and that must seek substantial financing in a highly restrictive lending environment to finish out the space for a tenant. The Mammoth Property is therefore unique in that it requires no additional capital for completion of Tenant Improvements or to remodel its space, in order successfully

emerge from chapter 11.

The Manager of MAMMOTH HENDERSON II LLC is Mammoth
Equities, LLC whose Managing Member is Robert Wish.  Robert
Wish has been active in commercial real estate investment and
development since 1965 and has been a general partner or
manager in several California limited partnerships and limited
liability companies. Mr. Wish has constructed numerous projects
in addition to acquiring completed projects for the benefit of
various entities formed by him. Mr. Wish has purchased
approximately fifty existing commercial properties ranging in
size from 4,000 to 145,000 square feet and has developed
twenty-eight commercial projects ranging in size from 2,400 to
168,000 square feet.  These projects include office, strip
center retail, mini storage (self-storage) and industrial.  He
has also developed over fifteen residential projects ranging in
size from a large single family custom home tract to a 496 unit
apartment building. Mr. Wish currently controls approximately
1.3 million square feet of commercial real estate in
California, Arizona, Nevada and Texas through several operating
partnerships some of which are managed by his existing company
Foremost Business Parks.

Mr. Wish has over thirty-five years experience in managing
multi tenant properties which are occupied by numerous small
tenants. Since 2004 Mammoth Equities has leased to more than
1,500 small businesses at properties similar in design to the
Mammoth Property.  As outlined above, it is the business
philosophy of Mr. Wish to develop each project with built-out

36

office suites, thereby affording tenants several options with which to match their space requirement.  Not only does this result in immediate occupancies and immediate rental streams, but when tenants vacate the property, minimal costs are borne by the landlord to release the space (typically paint and carpet cleaning only).

The Mammoth Property is managed by Mammoth Equities Property Management, Inc. who manages a portfolio of 20 similar buildings at 14 locations with approximately 1.15 million square feet.  Over 95% of the space managed by Mammoth Equities Property Management is multi-tenant office space similar to that of the Debtor.  Mammoth Equities Property Management's staff has extensive knowledge about the unique needs and strategies to successfully manage Mammoth model properties. Currently Mammoth Equities Property Management oversees 400+ small business tenants and has executed over 1,500 leases since 2004.  Mammoth Equities Property Management utilizes significant technological resources to perform management services including  fully integrated Accounting and PM Software, all paperless database and filing systems, high speed communications including the Internet and internal networks, fully redundant servers and personal computers and proven property management and property performance applications.

Mammoth Equities Property Management additionally handles all leasing for the properties and uses Mammoth's proprietary and unique leasing strategy as well as implementing comprehensive marketing and promotion programming.

**B.    Principals/Affiliates of Debtor's Business**

The Debtor, MAMMOTH HENDERSON II LLC is made up of 2 Members as listed in section 21 of the schedules.

**C.    Management of the Debtor Before and After the Bankruptcy**

Management of the Debtor before and after the filing of the Bankruptcy is by Mammoth Equities LLC.

**D.    Events Leading to Chapter 11 Filing**

Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case: Robert Wish formed MAMMOTH HENDERSON II on May 31, 2005. The Dingillo Family LLC contributed 81.4% of the land valued at $3,980,320 to the Mammoth Partnership in exchange for 8,139 membership units and the Henderson Parcel A LLC acquired the remaining 18.6% of the land for $930,000 in cash in exchange for 1,861 membership units. The cash and land contributed to the Mammoth Partnership enabled the Debtor to acquire the Mammoth Land and obtain the construction loan to develop the Mammoth Property.  After purchasing the Mammoth Land the debtor obtained a $20,800,000 construction loan from PFF in March, 2007 and commenced construction of the Mammoth Property the same month, completing construction of the Mammoth Property in June, 2008. Leasing commenced on the Mammoth Property in June 2008. The construction loan from PFF provided an interest reserve to make payments on the construction loan while the Mammoth Property underwent its leasing phase.

The completion of the construction of the Mammoth Property

38

1   was approximately 7 months after the onset of the recession

2   which began in earnest in November, 2007.  Although a project

3   the size of the Mammoth Property typically require an 18 month

4   marketing period to reach 90% occupancy, 5 months prior to the

5   marketing the economy began to slow approximately doubling the

6   estimated time it would take for the project to reach 90%

7   occupancy. Compounding the slowing of the economy was the

8   commencement of the construction of road improvements on or

9   about January, 2008 of ** on an approximately 5 mile long

10  stretch of 6 lane road which road fronts the Mammoth Property

11  that created access problems and confusion for potential

12  tenants driving by the Mammoth Property who were confronted

13  with heavy equipment, dirt roads kicking up dust and debris,

14  and difficulty in accessing the parking lot. The construction

15  project which was supposed to take 3 months ended up taking

16  over 1 year and was finally competed on or about January 2,

17  2010. The road construction had a serious and substantial

18  negative impact on leasing activity.  The construction of the

19  Potential tenants faced with the dirt road and a massive

20  construction zone complete with gravel, rock, dirt, dust,

21  concrete, and temporary roadways, simply ignored the Mammoth

22  Property as a potential office/retail location because of the

23  chaos and confusion caused by the road construction. When

24  potential tenants did make it to the building they typically

25  complained about their car being a mess from the dirt, dust,

26  and gravel and shared their suspicions that the road

27  improvement project never seemed to make significant progress

28

39

toward completion.

Since completion of the road construction, , leasing activity at the Mammoth Property has improved

In the recessionary economic environment, the Debtor continued leasing to new tenants but the recessions' impact on new leasing was exacerbated by the road construction, and the Debtor was unable to meet its occupancy projections.

In June 2008, as the impact of the ongoing road construction and the recession continued to negatively impact the pace of leasing at the Mammoth Property, the Debtor began negotiating a loan extension with U.S. Bank to extend the term of the Henderson Loan.  Contemporaneously with the Debtors negotiations to extend the term of the Henderson Loan, the Guarantors began negotiations to extend the term of the Corona Loan. As background, Robert Wish and Mammoth Equities, the Guarantors of the Henderson Loan are Guarantors of another separate and distinct U.S. Bank loan on the Corona Property.

The Henderson Loan was originally entered into on or about December 11, 2006, and provided for an initial maturity date of January 1, 2009, subject to three (3) successive six month extensions of the maturity date subject only to the payment of a loan fee of 0.25% as outlined in the Commitment Agreement by and between Debtor and PFF dated December 7, 2006. Notwithstanding the fact that the Henderson Loan and Corona Loan involved separate projects, separate collateral, separate and  independent loan documents, separate groups of investors, and separate borrowing entities (each of which were required by

U.S. BANK's loan documents to be "single purpose," "remote,"
independent, and separately operated and administered
entities), and notwithstanding applicable regulatory rules
requiring U.S. BANK to administer these as separate loans, U.S.
BANK consistently administered the Henderson Loan and the f
Loan as though they were one loan, and demanded to tie its
decisions and administration of one loan to the other.

On or about June 19, 2006, The Debtor submitted its
written request to U.S. BANK for a six-month extension of the
Henderson Loan maturity date, from January 1, 2009 to July 1,
2009.  On June 19, 2008, Mammoth Corona I also submitted its
written request for a six month extension of the Corona Loan,
from September 1, 2008 to March 1, 2009. U.S. BANK subsequently
extended the maturity date of the Corona Loan to March 1, 2009,
while the maturity date of the Henderson Loan was not extended.

Throughout the latter part of 2008, in view of the
impending Henderson Loan maturity date of January 1, 2009, the
Debtor undertook aggressive leasing efforts in order to
increase occupancy of the Buildings, and engaged in intensive
and concerted efforts to market the Project. U.S. BANK was
advised by the Debtor of the Debtor's re-doubled leasing
efforts.  U.S. BANK encouraged the Debtor in these efforts. At
no time during this period did U.S. BANK inform the Debtor that
U.S. BANK would not further extend the Henderson Loan, or that
U.S. BANK would commence enforcement of the Henderson Loan
based on the January 1, 2009 maturity date, or otherwise.  The
Debtor continually relied on the representations from U.S. BANK

41

contained in the Commitment that the Debtor was to be granted three successive extensions of the maturity date.

The first formal notice that the Debtor and Guarantors received from U.S. BANK regarding the maturity date of the Henderson Loan was not until May 14, 2009, at which time U.S. BANK delivered a written "Notice of Maturity," which simply noted that The Debtor needed to pay the Henderson Loan by the maturity date, but which did not identify any plans by U.S. BANK to proceed with enforcement actions.  On or about December 30, 2008, with the January 1, 2009 maturity only two days away, The Debtor was directed by U.S. BANK to continue to make monthly interest payments on the Henderson Loan post-maturity, while at the same time strongly suggesting that a further extension of the Corona Loan and an extension of the Henderson Loan would be forthcoming.  The Debtor followed U.S. BANK's instructions and continued to make, and U.S. BANK continued to receive, without reservation--monthly interest payments on the Henderson Loan post-maturity.

The Debtor made its last interest payment under the Henderson Loan on January 7, 2009 in the amount of $150,158.42. The same was accepted by U.S BANK.

Throughout the latter half of 2008, the Debtor reiterated its request for an extension of the maturity date as provided for in the Commitment.  Throughout this period, The Debtor received assurances that such an extension was forthcoming.

23.  Despite not approving the extension for The Debtor prior to the maturity date of January 1, 2009, U.S. BANK

42

continued to communicate to The Debtor that it was still entertaining an extension of the Henderson Loan; however, U.S. BANK began to direct its attention toward the Guarantors, and demanded that Guarantors turn over detailed financial information regarding their individual assets and "individual real estate investments."

Throughout the early portion of 2009, The Debtor, through its intermediary, BCI Capital Partners, LLC ("BCI") acted diligently to provide U.S. BANK the necessary documentation and evidence of financial solvency to demonstrate an ability to honor their loan obligations should the contractual extensions be provided.  BCI met with lackluster responses from U.S. BANK. U.S. BANK had recently taken over PFF Bank & Trust, and the internal restructuring caused substantial delay to the discussions and negotiations.

As part of these discussions the concept of lowering the interest rate floors on the Henderson Loan and the Corona Loan were discussed as a means of helping the Debtor to be able to service the Henderson Loan.  Both the Henderson Loan and Corona Loan were discussed in concert, as both Plaintiff and Defendant deemed the two separate project to be intrinsically related.

Throughout the early portion of 2009, The Debtor received requests for rent roll documentation, financial projection documentation and provided the same to U.S. BANK on the belief that U.S. BANK was in good faith going to honor its contractual obligations to provide the three six month extensions articulated in the Commitment.

43

In the early portion of the summer of 2009, the discussions turned hard nosed and non-committal with regard to the granting of the extensions.

On or about June 11, 2009, The Debtor received a Notice of Default.

On or about June 12, 2009, Mammoth Corona I received a Notice of Default.

30. Subsequent to the issuance of the aforementioned Notices of Default, U.S. BANK and both Mammoth Corona I and The Debtor continued discussions with regard to extensions for both loans. Representatives of U.S. BANK continued to solicit and The Debtor continued to provide financial projections for both projects in the interest of being granted the extensions. Separate loan restructuring proposals were submitted to U.S. BANK by the Debtor who was continually assured that U.S. BANK wanted Debtor to continue to manage and operate the Project.

Commencing on or about September 1, 2009, U.S. BANK had discussions with The Debtor's outside consultants, attempting to persuade them that if The Debtor were to "cooperate" with U.S. BANK (e.g., not resist foreclosure or receivership proceedings, walk away from the properties, essentially do as U.S. BANK says, etc.), such "good behavior" would accrue "political capital" with U.S. BANK, resulting in U.S. BANK's taking a softer stance toward enforcement of the Guaranties. In connection with such discussions, U.S. BANK emphatically suggested that The Debtor turn over the Office Building (and

44

that Mammoth Corona I turn over the Corona Property) to a manager hand-picked by (and thus beholden to) U.S. BANK. The Debtor and Guarantor provided separate proposals for resolution of the loan issues in writing to U.S. Bank in early and mid 2009. At no time did U.S. Bank indicate that they were unwilling to consider the proposals. In fact, U.S. Bank representatives affirmed that the proposals would be reviewed and a resolution would be achieved. Plaintiff requested that U.S. BANK simply confirm in writing its position that "cooperation" with U.S. BANK would result in resolution (given that U.S. BANK had already reneged on the representation in the Commitment regarding an extension of the loans), U.S. BANK flatly refused.

During the latter part of 2008, the Debtor and Guarantors received numerous assurances from U.S. BANK that a further extension of the Henderson Loan and the Henderson Loan would be seriously considered by U.S. BANK as the only condition specified in the Commitment for such an extension was the payment of a loan fee of 0.25%.

Based upon the care with which U.S. BANK refrained from threatening any imminent payment deadline or enforcement actions, as well as the representations in the respective Commitment's and oral assurances from U.S. BANK regarding an extension of the Henderson Loan and the Henderson Loan, The Debtor continued to aggressively market the leasing of the office spaces available, the Debtor expended substantial time, effort and monies pursuing the leasing of the available offices

45

and refrained from the pursuit of any potential refinancing through alternate lenders.

Fully aware of the complexities inherent in managing a specialty property such as the Mammoth Property, The Debtor refused.

Based upon Robert Wish's experience in the previous recession, the Debtor determined that the Mammoth Property would indeed lease up and that the value of the Mammoth Property would increase substantially once the recession ended; therefore, the Debtor refused to allow U.S. Bank to foreclose on the Mammoth Property and determined that a chapter 11 filing would enable the Debtor to pay all creditors in full as well as protect in many instances, the life savings of the LLC members.

Although prior to 2009, neither Robert Wish nor any of the partnerships he had formed over his 35 years in the real estate business had ever filed a chapter 11 and even though he made concerted efforts to avoid filing the herein referenced chapter 11 case, facing a pending foreclosure and unable to renegotiate the terms of the U.S. Bank Note, the Debtor filed for protection under Chapter 11 of the Federal Bankruptcy code on November 5, 2009.

**E.   Significant Events During the Bankruptcy**

   **1.Bankruptcy Proceedings**

The following is a chronological list of significant events which have occurred during this case:

On or about November 5, 2009, the Debtors' filed its chapter 11 case.

The Court has approved the employment of the following professionals:  Thomas C Corcovelos as Counsel for the Debtor.

On November 25, 2009, the following significant adversary proceeding was filed:  MAMMOTH HENDERSON II LLC a California limited liability company MAMMOTH EQUITIES LLC a Nevada limited liability company vs U S Bank N A a national banking association as successor in interest to PFF BANK TRUST and DOES 1 through 100 inclusive, removed to Bankruptcy court on November 25, 2009 as case No. 8-09:-AP-01763RK.  The case was previously pending in Riverside Superior Court Case No. CIVRS911734.

**2.   Other Legal Proceedings**

In addition to the proceedings discussed above, the Debtor is currently involved in the following non-Bankruptcy legal proceedings:

A    Notice of Default: On June 12, 2009, U.S. Bank commenced its non-judicial foreclosure proceedings against the Mammoth Property by causing a Notice of Default to be recorded with respect to the U.S. Bank Note.

B    On October 15, 2009 the Debtor filed a lawsuit in California Superior Court: MAMMOTH HENDERSON II , a Nevada Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company; vs. U.S. Bank, N.A. a national banking association as successor in interest to PFF BANK & TRUST; and DOES 1 through 100, inclusive, "case No. CIVRS911734.  The lawsuit seeks **Declaratory Relief alleging**

Breach of Contract, and Breach of Implied Covenant of Good
Faith and Fair Dealing.

**3.    Actual and Projected Recovery of Preferential or
Fraudulent Transfers**

Nothing is estimated to be realized from the recovery of
fraudulent and preferential transfers.  The following is a
summary of the fraudulent conveyance and preference actions
filed or to be filed in this case:  The Debtor does not expect,
at this time, to file any fraudulent conveyance or preference
actions in this case.

**4. Procedures Implemented to Resolve Financial Problems**

The Debtor has implemented the following procedures as
part of its strategy to successfully lease the Mammoth
Property:  The Debtor has increased its advertising budget,
initiated an incentive program offering free telephone service
in exchange for tenants signing a long term lease, and has
increased its outreach to the real estate brokerage community.

Moreover, the completion of the road construction is
enabling the Debtor to market the Mammoth Property without the
physical hindrances that have hobbled the Mammoth Property
since January, 2008.

**5.Current and Historical Financial Conditions**

The Debtor's debt service obligations were historically
paid through the interest reserve in the construction loan and
through capital infusions from Mammoth Equities to cover any
shortfall between the mortgage payment due and revenues
generated by the Mammoth Property. Although the Debtor's

48

current operations are not able to meet its debt service

obligations on Mammoth Property, the debtor projects that prior

to the Effective Date, there will be revenues sufficient to

make the full mortgage payments.

The identity and fair market value of the estate's assets

are listed in Exhibit A.

### III.

### SUMMARY OF THE PLAN OF REORGANIZATION

**A. What Creditors and Interest Holders Will Receive Under The
Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies

claims and interests in various classes according to their

right to priority.  The Plan states whether each class of

claims or interests is impaired or unimpaired.  The Plan

provides the treatment each class will receive.

**B.    Unclassified Claims**

Certain types of claims are not placed into voting

classes; instead they are unclassified.  They are not

considered impaired and they do not vote on the Plan because

they are automatically entitled to specific treatment provided

for them in the Bankruptcy Code.  As such, the Proponent has

not placed the following claims in a class.

**1.    Administrative Expenses**

Administrative expenses are claims for costs or expenses

of administering the Debtor's Chapter 11 case which are allowed

under Code section 507(a)(1).  The Code requires that all

administrative claims be paid on the Effective Date of the

1    Plan, unless a particular claimant agrees to a different

2    treatment.

3        The following chart lists <u>all</u> of the Debtor's § 507(a)(1)

4    administrative claims and their treatment under the Plan.

5

| Name | Amount Owed | Treatment |
|---|---|---|
| Thomas C Corcovelos | $1,000 | Paid on Effective Date |
|  |  |  |
|  |  |  |
|  |  |  |
| Clerk's Office Fees | $250 (estimated) | Paid in full on Effective Date |
| Office of the U.S. Trustee Fees | $500 (4th 1/4 ' 96) | Paid in full on Effective Date |
|  | TOTAL $1,750.00 |  |

16    <u>Court Approval of Fees Required:</u>

17        The Court must rule on all fees listed in this chart

18    before the fees will be owed.  For all fees except Clerk's

19    Office fees and U.S. Trustee's fees, the professional in

20    question must file and serve a properly noticed fee application

21    and the Court must rule on the application.  Only the amount of

22    fees allowed by the Court will be owed and required to be paid

23    under this Plan.

24        As indicated above, the Debtor will need to pay $1,750.00

25    worth of administrative claims on the Effective Date of the

26    Plan unless the claimant has agreed to be paid later or the

27    Court has not yet ruled on the claim.  As indicated elsewhere

28
                                    50

in this Disclosure Statement, Debtor will have approximately $10,000 in cash on hand on the Effective Date of the Plan. The source of this cash will be lease revenue.

**2.    Priority Tax Claims**

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). Except to the extent that the holder of a particular Allowed Priority Tax Claim agrees to a different treatment thereof, the Code requires that each holder of an Allowed Priority Tax Claim receive the present value of such Allowed Priority Tax Claim in deferred Cash payments over a period not exceeding six years from the date of assessment of such tax.

Treatment of Allowed Priority Tax Claims. The Debtor's Plan provides that deferred Cash payments will be paid in equal annual installments of principal and interest and will be in an amount sufficient to amortize each Allowed Priority Tax Claim fully over a period of six years from the Effective Date. The outstanding and principal amount of each Allowed Priority Tax Claim will bear interest, commencing on the Effective Date and continuing until such Allowed Priority Tax Claim is paid in full, at the lesser of: (i) the rate of six percent (6%) per annum; or (ii) the rate specified by Section 6621(a) of the Internal Revenue Code, as such rate is adjusted from time to time. Payments to holders of Allowed Priority Tax Claims will commence on the first anniversary of the Effective Date and will continue on each annual anniversary of the Effective Date.

1    The Reorganized Debtor will have the right to pay all

2    Allowed Priority Tax Claims, or any remaining balance of such

3    Claim, in full, at any time on or after the Effective Date,

4    without premium or penalty. The following chart lists all of

5    Debtor's Section 507(a)(8) priority tax claims and their

6    treatment under the Plan: **The Debtor has no Section 507(a)(8)**

7    **priority tax claims.** [3]

8    The following chart lists <u>all</u> of the Debtor's Section

9    507(a)(8) priority tax claims and their treatment under the

10   Plan:

| Description | Amount Owed | Treatment |
|---|---|---|
| | | |
| · Name = Not Applicable<br><br>· Type of tax = None<br><br>· Date tax assessed = Not Applicable | 0.00 | · Pymt interval        =<br>· Est. pymt amt/interval =<br>· Begin date          =<br>· End date            =<br>· Interest rate %      =<br>· Total payout amount%   = $ |

**C.    Classified Claims and Interests**

    **1.    Classes of Secured Claims**

    Secured claims are claims secured by liens on property of

the estate.  The following chart lists all classes containing

Debtor's secured pre-petition claims and their treatment under

the Plan.

//

//

//

───────────────

[3]    In the event any taxing agencies filed Priority Tax Claims, the Debtor
reserves the right to file an objection to such Claims on any appropriate
grounds.

52

1    //

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of: <br><br> · Name = Clark County Tax Assessor <br><br> · Collateral description = Property Tax Lien <br><br> · Collateral value = 25,000,000 <br><br> · Priority of security int. = 1st <br><br> · Principal owed = $61,505.04 <br><br> · Pre-pet. arrearage amount = N/A <br><br> · Post-pet. arrearage amount = None <br><br> · Total claim amount = $61,5054.04 | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Pymt interval   = Monthly <br> · Est. pymt amt/interval = $1042 <br> · Balloon pymt = 0 <br> · Begin date = 11/20/10 <br> · End date = 11/19/2016 <br> · Interest rate % = 6.0% <br> · Total payout % = $75,047 will be paid over 72 months at $1,042 per month on 100% of a principal balance of $61,504.04 <br> · Treatment of lien  =  Lien is retained and in full force and effect. |
|  |  |  |  |  |

Comments:  Class 1 consists of any and all secured claims for real property taxes and income taxes pertaining to the property.  Class 1 is impaired under the Debtor's Plan.  The Debtor proposes to satisfy the Allowed Secured Claim of the Class 1 Claimant by paying the Class 1 Claimant deferred cash payments equal to the value of its Allowed Secured Claim as of the Effective Date.  Commencing on the tenth (10th) day of the first full month after the Effective Date, such deferred cash payments will be made in equal monthly installments of

principal and interest in an amount sufficient to amortize the

Allowed Secured Claim over a period of seven (7) years, all due

in seven (7) years from the Effective Date.  The outstanding

and unpaid amount of the Allowed Secured Claim will bear

interest, commencing on the Effective Date and continuing until

such Allowed Secured Claim is paid in full, at the rate of 6.0%

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Secured claim of:<br><br>· Name =U.S. Bank<br><br>· Collateral description<br><br>= 1st Trust Deed<br><br>· Collateral value =<br><br>$25,000,000<br><br>· Priority of<br><br> security int. = 1st<br><br>· Principal owed =<br><br>$22,301,000<br><br>· Pre-pet. Arrearage 0<br><br>· Post-pet. arrearage<br><br>amount = $500,000 (est)<br><br>· Total claim amount =<br><br>$22,801,000 | N | Impaired,<br><br>Claims in<br><br>this class<br><br>are entitled<br><br>to vote on<br><br>the Plan. | · Pymt interval  = Monthly<br><br>· Est. pymt amt/interval =<br><br>$99.754<br><br>· Balloon pymt = $22,801,000<br><br>· Begin date = 11/20/10<br><br>· End date = 11/19/2017<br><br>· Interest rate % = .75 over<br><br>Wall Street Journal Prime Rate<br><br>which prime rate is estimated<br><br>at 4.5% on Effective Date.<br><br>· Total payout % = 100%<br><br>$31,180,368 will be paid over<br><br>84 months at $99,754 per month<br><br>on 100% of a principal balance<br><br>of $22,801,000.<br><br>· Treatment of lien = Lien is<br><br>retained and in full force and<br><br>effect. |

Comments:

    Class 2 consists of the Allowed Claims of U.S. BANK or the

holder of the U.S. BANK NOTE.  Class 2 is impaired under the
Plan.  As of the confirmation date, the U.S. BANK NOTE shall be
deemed satisfied and paid in full.  Within five (5) business
days after the Confirmation Date (but coterminous with the
execution and delivery of the U.S. BANK FIRST NOTE as described
below), U.S. BANK or the holder of the U.S. BANK NOTE shall
return to the Reorganized Debtor the U.S. BANK NOTE marked
"Paid in Full."  U.S. Bank or the holder of the U.S. BANK
Security Documents shall also return to the Reorganized Debtor
the U.S. Bank Security Documents marked "Canceled" and
"Superseded."  In full and complete satisfaction of the Allowed
Class 2 Claim, U.S. BANK or the holder of the Allowed Class 2
Claim shall receive the following:

(I)   Within five (5) business days after the Confirmation
Date (but coterminous with the cancellation and return of the
U.S. BANK NOTE as described above), the Reorganized Debtor
shall execute the U.S. BANK FIRST NOTE and the Amended U.S.BANK
Security Documents.

(a)   <u>The U.S. BANK FIRST NOTE</u>

The U.S. BANK FIRST NOTE and Amended U.S. Bank
Security Documents shall be in the same form as the U.S. BANK
FIRST NOTE and U.S. BANK NOTE Security Documents, respectively,
with the exception of the following:

The U.S. BANK FIRST NOTE and the Amended U.S. Bank
Security Documents shall eliminate any provision contained in
the U.S. BANK FIRST NOTE and the U.S. Bank Security Documents
that:

(1)    Require the Reorganized Debtor to pay a penalty or other charge for a pre-payment of any amount of the U.S. BANK FIRST NOTE;

(2)    Restricts a Qualified Buyer's right to assume, one time, the U.S. BANK FIRST NOTE;

(3)    Restricts the Reorganized Debtor from obtaining subordinate financing or recording a lien in favor of the Reorganized Debtor for the purpose of purchase financing; and

(4)    Requires the Reorganized Debtor to maintain a minimum balance in any bank account, pledge additional collateral or maintain other financial requirements; and

(5) Requires the Reorganized Debtor to lease space at minimum rental rates.

In addition, the U.S. BANK FIRST NOTE and the Amended U.S. Bank Security Documents shall provide the Debtor or its assignee with a first right of refusal to acquire the U.S. BANK FIRST NOTE at the price that U.S. Bank determines the Note may be sold for to a third party.

In the event there is any provision of the U.S. BANK FIRST NOTE which is inconsistent with the terms of the Plan, the terms of the Plan shall control.

The Amended U.S. Bank Security Documents shall secure a lien on the Mammoth Property with the same priority and validity that existed prior to the Debtor's alleged pre-petition default(s).  The Amended U.S. Bank Security Documents shall secure repayment of the U.S. BANK FIRST NOTE.  Since the U.S. BANK NOTE has been paid in full pursuant to the Plan, any

event of default that may have existed pre-petition with

respect to the U.S. BANK NOTE and/or the U.S. Bank Security

Documents shall be deemed cured and any notice of default which

may have been recorded pre or post-petition with respect to the

U.S. BANK NOTE and the U.S. Bank Security Documents shall be

deemed null and void and of no further force or effect, and

U.S. BANK or the holder of the U.S. BANK NOTE shall execute any

documents or instruments necessary to reflect the same,

including the execution and recordation of a release of notice

of default.

Payments on the U.S. BANK FIRST NOTE shall be made in

monthly installments, based upon the interest rate index and

margin that are identical to the pre-petition interest rate and

margin on the U.S. BANK NOTE excepting there shall be no floor

interest rate. The monthly payments shall be calculated with

reference to a variable annual rate of interest of the Wall

Street Journal Prime Rate plus three quarters of one percent,

(0.75%) and shall be interest only. Additionally, the U.S. BANK

FIRST NOTE shall have a the same lifetime cap on the adjustment

of the interest rate as is indicated in the U.S. Bank Security

Documents excepting the pay rate shall not exceed five percent

(5%) and any difference between the pay rate and the contract

interest rate shall accrue and be added to the principal amount

due on the U.S. BANK FIRST NOTE. Interest shall begin to accrue

on the U.S. BANK FIRST NOTE as of the Effective Date.  The

first (1st) payment shall be due on the fifteenth (15th) day of

the first (1st) full month following the Effective Date, and

shall be in an amount equal to a percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator).  Thereafter, payments shall be due on the fifteenth (15th) day of each and every month until the eighty-fourth (84th) month after the Effective Date at which time the entire outstanding balance of the U.S. BANK FIRST NOTE shall be all due and payable.  Upon payment in full of the U.S. BANK FIRST NOTE, the lien evidenced by the Amended U.S. Bank Security Documents shall be deemed satisfied and shall be deemed canceled.

The Guarantees signed by the Debtor, Robert Wish, Mammoth Equities and Debtor affiliates shall not be enforced post petition as long as post petition payments are made on the U.S. BANK FIRST NOTE.

The Reorganized Debtor shall have the right to voluntarily transfer title to Mammoth Property to any third party after the confirmation date, and this transfer shall not confer upon the Class 2 Claimant the right to accelerate the payment of the Claim, or to change, alter or amend the treatment thereof as provided in the Plan.  In addition, the proposed transferee, if a Qualified Buyer, may, at its option in connection with the contemplated transfer of title, assume the then outstanding contractual obligations of the Reorganized Debtor to the Class 2 Claimant with the Reorganized Debtor and Guarantors thereby released from further liability under the U.S. BANK FIRST NOTE

and the Amended U.S. Bank Security Documents to said Claimant,

provided that the proposed Qualified Buyer pays to the Class 2

Claimant, prior to the recordation of the transfer of title, a

one-time "assumption fee," in cash, equal to one percent (1%)

of the then outstanding balance under the U.S. BANK FIRST NOTE.

In the event that the Reorganized Debtor defaults in its

obligation to pay each payment due and payable under the U.S.

BANK FIRST NOTE and the Amended U.S.BANK Security Documents,

the holder of the U.S. BANK FIRST NOTE shall be entitled to

record a notice of default and accelerate the entire unpaid

indebtedness and/or exercise such other remedies as provided

under the U.S. BANK FIRST NOTE and the Amended U.S. Bank

Security Documents or under applicable California law.  The

Reorganized Debtor shall be entitled to cure and reinstate any

such default under applicable California law.

Nothing in the Plan shall enhance or otherwise increase

the rights of the holder of the Class 2 claim to seek recovery

on its claim as against any party other than the Reorganized

Debtor.

//

//

//

//

//

//

//

//

//

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|--------|-------------|----------------|----------------|-----------|
| 3 | Secured claim of: <br><br> · Name = New Life Carpets <br><br> · Collateral description = Mechanics Lien <br><br> · Collateral value = $25,000,000* <br><br> · Priority of security int. recorded mechanics lien <br><br> · Principal owed = $2,363 <br><br> · Pre-pet. arrearage amount = $ (included above) <br><br> · Post-pet. arrearage amount = N/A <br><br> · Total claim amount = $2,363 | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Pymt interval  = Monthly <br><br> · Est. pymt amt/interval = $35 <br><br> · Balloon pymt  $0 <br><br> . Begin date = 11/20/10 <br><br> · End date = 11/19/2017 <br><br> · Interest rate % = 3 <br><br> · Total payout % = $2,963 will be paid over 84 months at $35 per month on 100% of a principal balance of $2,363. <br><br> · Treatment of lien = Lien is converted to a deed of trust in the same priority position as the pre-petition New Life Carpets mechanics Lien. |

Comments:

Class 3 consists of the Allowed Claim of New Life Carpets or the holder of the New Life Carpets Mechanics Lien.  Class 3 is impaired under the Plan.  As of the confirmation date, in

full and complete satisfaction of the Allowed Class 3 Claim,

New Life Carpets or the holder of the Allowed Class 3 Claim

shall receive the following:

(I)   Within five (5) business days after the Confirmation

Date, (but coterminous with the cancellation and removal of the

New Life Carpets Mechanics Lien), the Reorganized Debtor shall

execute the New Life Carpets Note and the New Life Carpets Note

Security Documents.

The New Life Carpets Note shall secure a lien on the

Mammoth Property with the same priority that existed for New

Life Carpets on the petition date. The New Life Carpets Note

shall secure repayment of the New Life Carpets Mechanics Lien.

New Life Carpets or the holder of the Class 3 Claim shall

execute any documents or instruments necessary to release the

Mechanics lien, including the execution and recordation of a

release of Mechanics Lien.

Payments on the New Life Carpets Note shall be made in

monthly installments of principal and interest, with interest

calculated with reference to a fixed annual rate of interest of

three percent (3%) amortized over 84 months.  Interest shall

begin to accrue on the New Life Carpets Note as of the

Effective Date.  The first (1st) payment shall be due on the

fifteenth (15th) day of the first (1st) full month following

the Effective Date, and shall be in an amount equal to a

percentage of a full monthly installment payment derived from

the number of days remaining in the month in which the

Effective Date occurs (the numerator) divided by the number of

days in the month in which the Effective Date occurs (the

denominator).  Thereafter, payments shall be due on the

fifteenth (15th) day of each and every month until the twenty-

fourth (24th) month after the Effective Date at which time the

entire outstanding balance of the New Life Carpets Note shall

be all due and payable.  Upon payment in full of the New Life

Carpets Note, the lien evidenced by the New Life Carpets Note

shall be deemed satisfied and shall be deemed canceled.

The Reorganized Debtor shall have the right to voluntarily

transfer title to the Mammoth Property to any third party after

the confirmation date, and this transfer shall not confer upon

the Class 3 Claimant the right to accelerate the payment of the

Claim, or to change, alter or amend the treatment thereof as

provided in the Plan.  In addition, the proposed transferee, if

a Qualified Buyer, may, at its option in connection with the

contemplated transfer of title, assume the then outstanding

contractual obligations of the Reorganized Debtor to the Class

3 Claimant with the Reorganized Debtor thereby released from

further liability under the New Life Carpets Note.

In the event that the Reorganized Debtor defaults in its

obligation to pay each payment due and payable under the New

Life Carpets Note and the New Life Carpets Note Security

Documents, the holder of the New Life Carpets Note shall be

entitled to record a notice of default and accelerate the

entire unpaid indebtedness and/or exercise such other remedies

as provided under the New Life Carpets Note and New Life

Carpets Note Security Documents or under applicable California

law.  The Reorganized Debtor shall be entitled to cure and

reinstate any such default under applicable California law.

Nothing in the Plan shall enhance or otherwise increase

the rights of the holder of the Class 3 claim to seek recovery

on its claim as against any party other than the Reorganized

Debtor.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|--------|-------------|----------------|----------------|-----------|
| 4 | Secured claim of:<br><br>· Name = American<br><br>constructors Inc.,<br><br>· Collateral<br><br>  description =<br><br>Mechanics Lien<br><br>· Collateral value =<br><br>$25,000,000*<br><br>· Priority of<br><br>  security int. recorded<br><br>mechanics lien<br><br>· Principal owed =<br><br>$2,363<br><br>· Pre-pet. arrearage<br><br>  amount = $ (included<br><br>above)<br><br>· Post-pet. arrearage<br><br>  amount = N/A<br><br>· Total claim amount =<br><br>$2,363 | N | Impaired,<br><br>Claims in<br><br>this class<br><br>are<br><br>entitled<br><br>to vote on<br><br>the Plan. | · Pymt interval  = Monthly<br><br>· Est. pymt amt/interval = $35<br><br>· Balloon pymt  $0<br><br>. Begin date = 11/20/10<br><br>· End date = 11/19/2017<br><br>· Interest rate % = 3<br><br>· Total payout % = $2,963<br><br>will be paid over 84 months at<br><br>$35 per month on 100% of a<br><br>principal balance of $2,363.<br><br>· Treatment of lien = Lien is<br><br>converted to a deed of trust<br><br>in the same priority position<br><br>as the pre-petition American<br><br>constructors Inc., mechanics<br><br>Lien. |

Comments:

Class 4 consists of the Allowed Claim of American constructors Inc., or the holder of the American constructors Inc., Mechanics Lien.  Class 4 is impaired under the Plan.  As of the confirmation date, in full and complete satisfaction of the Allowed Class 4 Claim, American constructors Inc., or the holder of the Allowed Class 4 Claim shall receive the following:

(I)   Within five (5) business days after the Confirmation Date, (but coterminous with the cancellation and removal of the American constructors Inc., Mechanics Lien), the Reorganized Debtor shall execute the American constructors Inc., Note and the American constructors Inc., Note Security Documents.

The American constructors Inc., Note shall secure a lien on the Mammoth Property with the same priority that existed for American constructors Inc., on the petition date. The American constructors Inc., Note shall secure repayment of the American constructors Inc., Mechanics Lien.  American constructors Inc., or the holder of the Class 4 Claim shall execute any documents or instruments necessary to release the Mechanics lien, including the execution and recordation of a release of Mechanics Lien.

Payments on the American constructors Inc., Note shall be made in monthly installments of principal and interest, with interest calculated with reference to a fixed annual rate of interest of three percent (3%) amortized over 84 months. Interest shall begin to accrue on the American constructors

Inc., Note as of the Effective Date.  The first (1st) payment shall be due on the fifteenth (15th) day of the first (1st) full month following the Effective Date, and shall be in an amount equal to a percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator).  Thereafter, payments shall be due on the fifteenth (15th) day of each and every month until the twenty-fourth (24th) month after the Effective Date at which time the entire outstanding balance of the American constructors Inc., Note shall be all due and payable.  Upon payment in full of the American constructors Inc., Note, the lien evidenced by the American constructors Inc., Note shall be deemed satisfied and shall be deemed canceled.

The Reorganized Debtor shall have the right to voluntarily transfer title to the Mammoth Property to any third party after the confirmation date, and this transfer shall not confer upon the Class 4 Claimant the right to accelerate the payment of the Claim, or to change, alter or amend the treatment thereof as provided in the Plan.  In addition, the proposed transferee, if a Qualified Buyer, may, at its option in connection with the contemplated transfer of title, assume the then outstanding contractual obligations of the Reorganized Debtor to the Class 4 Claimant with the Reorganized Debtor thereby released from further liability under the American constructors Inc., Note.

In the event that the Reorganized Debtor defaults in its

obligation to pay each payment due and payable under the American constructors Inc., Note and the American constructors Inc., Note Security Documents, the holder of the American constructors Inc., Note shall be entitled to record a notice of default and accelerate the entire unpaid indebtedness and/or exercise such other remedies as provided under the American constructors Inc., Note and American constructors Inc., Note Security Documents or under applicable California law.  The Reorganized Debtor shall be entitled to cure and reinstate any such default under applicable California law.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 4 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

**2. Classes of Priority Unsecured Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a Claim receive cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim. **The Debtor has no Claims of the type identified in Code Sections 507(a)(3), (4), (5), (6), and (7).**

1    ### 3. Classes of General Unsecured Claims

2    General unsecured claims are unsecured claims not entitled

3    to priority under Code Section 507(a).

4    The following chart identifies the Plan's treatment of the

5    classes containing all of Debtor's General Unsecured Claims:[4]

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 5 | General unsecured claims<br><br>· Total amt of claims = $26,319.44 | y Impaired non-insider claims in this class are entitled to vote on the plan | Pymt interval = Monthly<br>· Est. pymt amt/interval = $66<br>· Balloon pymt = $26,319.44<br>· Begin date = 11/20/2012<br>· End date = 11/19/2017<br>· Interest rate % = 3%<br>· Total payout = $30,267<br>Claim will be paid over 84 months beginning in the 25$^{t}$ month $66 per month on 100% of a principal balance of $26,319.44 or Class 4 Claimants may elect to receive 50% of their claim 12 months after the Effective Date as payment in full.<br><br>· Treatment of lien = Lien is converted to a promissory note. |

14    Class 5 consists of the Allowed Claims of the General

15    Unsecured Creditors.   Class 5 is impaired under the Plan. In

16    full and complete satisfaction of the Class 5 Claim, the Class

17    5 Claimant shall be treated as follows: On or before the

18    Effective Date, the Debtor shall execute a promissory note with

19    each holder of a Class 5 Claim.   The Note will provide that,

20    commencing on the 25th month following the Effective Date of the

21    Plan, the obligations evidenced by the promissory note will

22    accrue interest at the rate of three percent (3%).   Commencing

23    on the fifteenth (15th) day of each month thereafter through

24    the eighty fourth (84th) month following the Effective Date,

25    the Reorganized Debtor shall make equal monthly payments of

26    interest to the Class 5 Claimant.   The Promissory Note shall be

---

[4]    The Debtor reserves its right to object to any of the Claims filed by
the following Creditors on any reasonable grounds.

due and payable eighty four (84) months following the Effective Date, excepting that the Class 5 Claimants may elect to receive a one time lump sum payment equal to fifty percent (50%) of their allowed claim as payment in full on the 13th month following the Effective Date. In the event of a sale of the Mammoth Property the Class 5 Claimants Claims shall be payable at close of escrow.  In the event funds are not sufficient to pay the Class 5 Claimants upon sale of the Mammoth Property, the Class 5 Claimants shall receive a pro-rata share of the funds available by dividing the total amount of money each Class 5 Claimant is owed by the sum of the Class 5 Claimants claim and multiplying that percentage by the amount of money available to pay the Class 5 Claimants after sale of the Mammoth Property.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 5 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

### 4. Classes of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the debtor.  If the debtor is a corporation, entities holding preferred or common stock in the debtor are the interest holders.  If the debtor is a partnership, the interest holders include both general and limited partners.  If the debtor is an individual, the debtor is the interest holder.  The following chart identifies the Plan's treatment of the class of interest holders.

//

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 6 | Interest holders<br><br>There are 2 interest holders whose names and percentage interest are listed in Exhibit F | Insider; claims in this class are not entitled to vote on the Plan | Class 6 is unimpaired under the Plan and will receive the pro-rata share of monies available after payment to classes 1,2,3,4 and 5 |

**Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of any Disputed Claim or Disputed Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest, and then only to the extent it becomes an Allowed Claim or Allowed Interest. Any Proof of Claim or Proof of Interest filed which differs from the Scheduled amount is deemed to be a Disputed Claim or Disputed Interest.**

**9.**    **Resolution of the State Court Actions**

The Debtor has removed its state court action MAMMOTH HENDERSON II , a Nevada Limited Liability Company; MAMMOTH EQUITIES, LLC, a Nevada limited liability company; vs. U.S. Bank, N.A. a national banking association as successor in interest to PFF BANK & TRUST; and DOES 1 through 100, inclusive, "case No. CIVRS911734 to the federal bankruptcy

69

court, case No. 8-09:-AP-01763RK. The Debtor intends to seek

damages of $13,000,000 in the adversary proceeding.

**D.    Means of Effectuating the Plan**

**1.    Funding for the Plan**

The Plan will be funded by the following:  The Reorganized

Debtor shall make all payments due under the Plan out of the

funds on hand in the Debtor's Estate as of the Effective Date,

through the Net Operating Income generated by the lease revenue

and or the eventual sale or refinance of the Mammoth Property.

The Debtor believes that Mammoth Property will generate lease

revenue sufficient to make the monthly payments required under

the plan.

**2.    Post-Confirmation Management**

Mammoth Equities Property Management Group who is the

current property manager will be retained as post-confirmation

management.  Its duties will include supervision of the on-site

manager, contracting with contractors and repairmen for

maintenance and repairs, prosecuting unlawful detainer actions

and attempting to collect rents from those tenants who do not

pay the on-site manager, paying bills, and maintaining books

and records for the property.

**3.    Disbursing Agent**

The Debtor shall act as the Disbursing Agent for the

purpose of making all distributions provided for under the

Plan.  The Disbursing Agent shall serve <u>without</u> bond and shall

receive compensation equal to 1% of the gross sales price of

the Mammoth Property for distribution services rendered and

1  expenses incurred pursuant to the Plan.

2  **E.    Risk Factors**

3      The proposed Plan has the following risks  which could

4  adversely impact the Debtor's ability to make Plan payments:

5  (1) there is a possibility of default, i.e., possibility of

6  inability to pay Plan payments, (2) the financial projections

7  provided by the Plan Proponent may not be realized, (3) the

8  business environment and rental market may decline from its

9  present level, (4) competition with the Debtor in the rental

10 market may increase, (5) the legal environment in terms of laws

11 and regulations could change and have a negative impact upon

12 the Debtor, (6) the reorganized Debtor could be sued and the

13 costs and expenses of litigation could impact the Debtor's

14 financial circumstances.

15 **F.    Other Provisions of the Plan**

16         **1.    Executory Contracts and Unexpired Leases**

17             **a.    Assumptions**

18     The following are the unexpired leases and executory

19 contracts to be assumed as obligations of the reorganized

20 Debtor under this Plan (see Exhibit D for more detailed

21 information on unexpired leases and executory contracts to be

22 assumed):

23     No leases shall be assumed.

24     The Reorganized Debtor shall assume the "Mammoth Equities

25 Property Management Group" property management contract in

26 accordance with the provisions as set forth in the existing

27 contract.

28

On the Effective Date, the unexpired leases referenced above (if any) and the executory contract referenced above shall be assumed as obligations of the reorganized Debtor.  The Order of the Court confirming the Plan shall constitute an Order approving the assumption of the lease and executor contract listed above.  If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Section {I.B.3.} of this document for the specific date.

**b.     Rejections**

On the Effective Date, the following executory contracts and unexpired leases will be rejected:  <u>None</u>

The Order Confirming the Plan shall constitute an Order approving the rejection of the lease or contract.  If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Section {I.B.3.} of this document for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS <u>- not applicable</u>.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**2.     Changes in Rates Subject To Regulatory Commission**

72

**Approval**

This Debtor <u>is not</u> subject to governmental regulatory commission approval of its rates.

**3.    Retention of Jurisdiction**

The Court will retain jurisdiction to the extent provided by law.

**G.   Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability:

<u>The Debtor does not believe that confirmation or consummation of the Debtor's Plan will have any tax consequences to the Debtor.</u>

<u>Creditors and interest holders are advised to consult with their own tax advisors respecting the tax consequences, if any, of the Plan, including state and local tax consequences.</u>

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The Proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

**A.    Who May Vote or Object**

**1.    Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.    Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### a.    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE IS

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.  Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

### b.    What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class

75

100% of what they are owed.

In this case, the Proponent believes that classes 1, 2, 3, 4 and Class 5 Claimants are non-insider classes that are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponent believes that there are no classes that are unimpaired. Holders of claims in unimpaired classes do not have the right to vote to accept or reject the Plan.  Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

    3.   **Who Is Not Entitled to Vote**

        The following four types of claims are not entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY

STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section {IV.A.8.}.

### 6. Votes Necessary for a Class to Accept the Plan

Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if: (a) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan, and (b) more than one-half (1/2) in number of the holders of such Allowed Claims actually voting in such Class (other than Claims by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan.

No Class of Interests is entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 7.    Treatment of Nonaccepting Classes

As noted above even if _all_ impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The party proposing this Plan _will_ ask _the Court_ to confirm this Plan by cramdown on impaired classes _1, 2, 3 and 4_ if any of these classes do not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not

less than the amount that such holder would receive or retain

if the Debtor were liquidated under Chapter 7 of the Bankruptcy

Code.

In a Chapter 7 case, the Debtor's assets are usually sold

by a Chapter 7 trustee.  Secured creditors are paid first from

the sales proceeds of properties on which the secured creditor

has a lien.  Administrative claims are paid next.  Next,

unsecured creditors are paid from any remaining sales proceeds,

according to their rights to priority.  Unsecured creditors

with the same priority share in proportion to the amount of

their allowed claim in relationship to the amount of total

allowed unsecured claims.  Finally, interest holders receive

the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must

find that all creditors and interest holders who do not accept

the Plan will receive at least as much under the Plan as such

holders would receive under Chapter 7 liquidation.  The Plan

Proponent maintains that this requirement is met here for the

following reasons:  The Debtor's primary asset is the Mammoth

Property, along with the Mammoth Adversary Action against U.S.

Bank as successor in interest to PFF Bank and Trust.  The

Mammoth Property is encumbered by a first-priority lien in

favor of U.S. Bank, the holder of the U.S. BANK NOTE.  The

balance of the U.S. BANK NOTE as of the Petition Date was

approximately $22,301,000. Based upon the Debtor's estimate,

the liquidated value of Mammoth Property is $18,750,000.

Assuming that in a Chapter 7 proceeding, the liquidation value

could be obtained, and further assuming that there would be
normal costs of sale and other costs of administration
attendant to the Chapter 7 proceeding, there would not be
sufficient proceeds generated by a sale of the Property to even
pay the U.S. BANK NOTE.  The conclusion that necessarily
follows is that Unsecured Creditors of the Debtor's Estate
would not receive any distribution were this Chapter 11
proceeding converted to one under Chapter 7 of the Code.  The
plan, which provides for a distribution to Unsecured Creditors,
clearly provides a greater return to Unsecured Creditors than
that which would be achieved in a Chapter 7.  Consequently, the
Debtor believe that the Plan, as proposed, provides to
Unsecured Creditors more than they would receive were the
Debtor's Case converted to one under chapter 7 of the Code. The
Plan proposes to pay general unsecured creditors approximately
100% of their total claims while a liquidation of the Debtor's
estate would result in a 0% dividend.  In a Chapter 7 case, a
trustee is appointed and entitled to compensation from the
Bankruptcy estate in an amount not to exceed 25% on the first
$5,000 of moneys disbursed, 10% on any amount over $5,000 but
less than $50,000, 5% on any amount over $50,000 but not in
excess of $1 million and 3% on all amounts over $1 million.  In
this case, the trustee's compensation is estimated to equal
$597,000 based upon a liquidated value of the Mammoth Property
of $18,750,000 which is equal to 75% of the fair market value
of the Property.  Through the Plan however, no trustee's
compensation will be incurred.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under Chapter 7 liquidation. (See Exhibit A for a detailed explanation of how the following assets are valued. This information is provided by the Debtor.)  For purposes of the liquidation analysis, the state court action has been given a zero value as it is unlikely a chapter 7 trustee would fund the litigation.

## ASSETS VALUED AT LIQUIDATION VALUES

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Cash on hand | $0 | |
| Mammoth Property | $18,750,000 | |
| Adversary Proceeding | 0 | |
| Recovery From Avoidance Actions | $.00 | The Debtor does not anticipate that there will be any Avoidance Actions filed. |
| **Total Assets At Liquidation Value** | $18,750,000 | |
| **LESS LIABILITIES IN CHAPTER 7 CASE** | | |
| Less: Secured Creditor Recovery  1[5] | $22,807,885 | |

5

| U.S. BANK NOTE on Effective date | $22,801,000 |
|---|---|
| New Life Carpets | $2,363 |
| American Constructors Inc. | 4,522 |
| | |
| | |
| | |
| TOTAL | $22,807,885 |
| | |
| | |

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| Less: Chapter 7 trustee's fees and expenses | $597,000 | |
| Less: Chapter 11 administrative expenses<br>Law offices of Thomas C Corcovelos<br>Clerk of Court Fees $200.00<br>UST Fees $500.00 | $1,000<br>$250<br>$500 | |
| Less: Priority Claims | $.00 | |
| **Balance for unsecured Claims** | $.00 | |
| | | |
| | | |
| **Total amount of Unsecured Claims** | $26,319.44 | |
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS [6] WOULD RECEIVE OR RETAIN IN A CHAPTER 7 LIQUIDATION:[7]** | 0.00% | |

[6]

| Proceeds From Liquidation of the Mammoth Property | $18,750,000 |
|---|---|
| Less: U.S. BANK NOTE | (22,801,000) |
| Less: Mechanics Liens | ($6,885) |
| | |
| Balance Available for Chapter 7 Administrative Fees and Costs ($597,000), Chapter 11 Administrative Fees and Costs ($1,750.00) | $0 |
| Balance for Unsecured Claims | $.00 |
| | |
| | |
| | |
| | |

[7]     Note: If this percentage is greater than the amount to be paid to the

| ASSETS AT LIQUIDATION VALUE | LIQUIDATION VALUE | DEBTOR'S BASIS FOR LIQUIDATION VALUE |
|---|---|---|
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN:** | **One Hundred Percent of their Allowed Claim** | |

Below is a demonstration, in tabular format, that all Creditors and interest holders will receive at least as much under the Plan as such Creditor or holder would receive under a Chapter 7 liquidation.

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100.00% | Estimated funds available for Administrative Claims would be $0 (Chapter 7 Administrative Fees and Costs are estimated at $252,750 and Chapter 11 Administrative Fees and Costs are estimated at $1,750.00) |
| | | |
| Class 1 – U.S. Bank . | 100.00% | 78% |
| Class 2 – New Life Carpets | 100.00% | 0% |
| Class 3 American Constructors Inc | 100.00% | 0% |
| Class 4 – General Unsecured Creditors. | 50% to 100% | 0% |
| | | |
| | | |
| | | |
| | | |

unsecured Creditors on a "present value basis" under the Plan, the Plan is not confirmable unless Proponent obtains acceptance by every Creditors in an impaired class.

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Class 5 – Interest Holders | To receive pro-rata distribution of remaining Proceeds after payment of all Allowed Administrative Claims, all Allowed Secured Claims, all Allowed Priority Claims and all Allowed Unsecured Claims | 00% |

## C. Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

Cash Debtor will have on hand by Effective Date          $10,000.00

**To Pay:** Administrative claims                                    $1,750.00

**To Pay:** Statutory costs & charges                              00.00

Balance after paying these amounts…..................$8,250.00

The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

+$10,000     Approximate cash in Debtors DIP account

$10,000.00   **Total**

84

The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments.

The Proponent has provided financial projections. Please refer to Exhibit C for the relevant financial projections.  YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL PROJECTIONS.

In summary, the Plan proposes to pay the Class 1,2,and creditors through the net revenues generated from the leasing of the Mammoth Property beginning on the Effective date and or through the eventual sale or refinance of the Mammoth Property.

The final payment under the Plan is expected to be paid on October 19, 2017.  The Plan Proponent contends that Debtor's financial projections are feasible.

**V.    EFFECT OF CONFIRMATION OF PLAN**

A.    <u>Discharge</u>

This Plan provides that upon <u>confirmation of the plan</u>, Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan to the extent specified in 11 U.S.C. § 1141.  However, the discharge will not discharge any liability imposed by the Plan.

**B.    Revesting of Property in the Debtor**

Except as provided in Section {V.E.}, and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

85

**C.    Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.    Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

**E.    Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, estate.  The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized

1   by the Court during this case.

2          The order confirming the Plan may also be revoked under

3   very limited circumstances.  The Court may revoke the order if

4   the order of confirmation was procured by fraud and if a party

5   in interest brings an adversary proceeding to revoke

6   confirmation within 180 days after the entry of the order of

7   confirmation.

8   **F.    Final Decree**

9          Once the estate has been fully administered as referred to

10  in Bankruptcy Rule 3022, the Plan Proponent, or such other

11  party as the Court shall designate in the Plan Confirmation

12  Order, shall file a motion with the Court to obtain a final

13  decree to close the case.

14                          Respectfully submitted,

15
    DATED: February 2, 2010
16
    MAMMOTH HENDERSON II LLC
17  A Nevada Limited Liability Company

18
    By:____/s/ Robert Wish_____
19        Robert Wish
          Managing Member of Mammoth Equities LLC
20        The manager of MAMMOTH HENDERSON II LLC

21

22  PRESENTED BY:
    Law offices of Thomas C Corcovelos
23
    BY:    __/s/ Thomas Corcovelos____
24        Thomas C Corcovelos

25  Attorneys for Debtor and
    Debtor in Possession
26

27

28
                          87

# VI.

## SUPPORTING DECLARATIONS

### DECLARATION OF ROBERT WISH

I, Robert Wish, declare as follows:

I am the managing member of Mammoth Equities LLC, the Manager of the debtor and debtor in possession in the bankruptcy case of In re. **MAMMOTH HENDERSON II LLC**, Case No. 8:09-bk-22234-RK-

1.      I make this declaration in support of approval of Debtor's Disclosure Statement Describing Debtor's Chapter 11 Plan of Reorganization (the "Disclosure Statement").  I have personal knowledge of the matters set forth in this Declaration and if called upon to testify, I could and would testify competently thereto.

2.      I have read the Disclosure Statement and, to the best of my knowledge, all of the information contained therein is true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 2, 2010  at San Juan Capistrano, California.

/s/ Robert Wish
Robert Wish

**EXHIBIT A**

**- LIST OF ALL ASSETS**

1)    A three-story 100% improved 66,284 square foot multi

tenant office building with all office space built out,

divisible down to two office suites, designed for maximum

flexibility and ready for occupancy along with two 2 multi-

tenant retail buildings totaling 13,582 square feet (8,368 and

5,351 square feet respectively) located at 2470 Saint Rose

Parkway, Henderson Nevada totaling further described below:

Foundation:           Poured Concrete

Construction:         Steel

Exterior

Walls                 Walls are concrete paneled

Windows:              Glass and concrete/Aluminum frame dual pane
                      tinted glass

Roof:                 Peaked steel plate joist system

Walls:                Painted drywall with variations to tenant
                      specifications

Floor Coverings:      Commercial grade short loop carpet over
                      concrete

Ceilings:             Typically suspended acoustic ceiling pads

Lighting:             Suspended and recessed fluorescent and
                      incandescent lighting

HVAC:                 Roof-top mounted head pump systems operated
                      by thermostats and time clocks

Electrical:           1200 amp, 227/480V, 3-phase, 4-wire.
                      Tenant spaces are separately measured for

1                        electrical – each tenant has its own

2                        electric meter

3   Restrooms:          One men's and one women's restroom per

4                        floor

5   Fire Protection:    100% wet sprinkler system

6   Elevators:          Three 3,500 lb. capacity Otis hydraulic

7   Parking Ratio:      1/3.30

8   2) Personal Property consisting of furniture fixtures and

9   equipment

10

11  2) Mammoth Adversary Proceeding

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B – List of Litigation**

1.    <u>MAMMOTH HENDERSON II</u> , a Nevada Limited Liability Company;

MAMMOTH EQUITIES, LLC, a Nevada limited liability company; and

ROBERT L. WISH, an individual, vs U.S. Bank, N.A. a national

banking association as successor in interest to PFF BANK &

TRUST; and DOES 1 through 100, inclusive, "case No. 8-09:-AP-

01763RK.

        The June 12, 2009, non-judicial foreclosure proceedings

initiated by U.S. Bank against the Debtor.

1

## EXHIBIT C - FINANCIAL PROJECTIONS

2

This information is supplied by <u>the Debtor</u> and is based on

3

Debtors development experience.

4

5

**MAMMOTH HENDERSON II LLC Financial Projections**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT D - UNEXPIRED LEASES TO BE ASSUMED:**

| LEASES | ARREARS/DMGS | METHODS OF CURE |
|---|---|---|
| ·Description = N/A<br><br>·Lessor's name = N/A<br>·Lessee's name =<br><br>·Expiration date = vary | ·Default amt = 0<br>·Actual pecuniary loss  =0 | ·Method of curing default &<br>  loss = Not<br>  Applicable |
|  |  |  |
|  |  |  |

**No Leases are being assumed**


### Executory Contracts to be Assumed


The Reorganized Debtor shall assume the "Mammoth Equities Property Management Group" property management contract in accordance with the provisions as set forth in the existing contract.

1   **EXHIBIT E– LIST OF GENERAL UNSECURED CREDITORS**

2   To be provided 21 days before disclosure statement hearing

**EXHIBIT F– LIST OF EQUITY INTEREST HOLDERS**

Name

% Interest

Henderson Parcel A, LLC                18.6%

Dingillo Family LLC                    81.4%

**EXHIBIT G- LAST TWO YEARS FINANCIAL STATEMENTS**